# Court of Appeals

### October, 1886.

## PEOPLE v. BECKWITH.

### (Affirming 4 *N. Y. Crim. Rep.*, 335.)

#### HOMICIDE—DELIBERATION AND PREMEDITATION—JUROR.

If a purpose to kill be present, then a homicide is murder in one of its degrees.

In manslaughter the purpose to kill is absent.

The time of deliberation and premeditation need not be long, and may be short. If it furnishes room and opportunity for reflection, and the facts show that such reflection existed, and the mind was busy with its design and made the choice with a full chance to choose otherwise, this shows deliberation and premeditation.

The grade of the crime is a question of fact for the jury, acting under proper instruction as to the law.

A juror who is in the employment of a corporation of which the district attorney is president but has nothing to do with the emploment or discharge of its employees, and no personal relations with the juror beyond those of persons living in the same town, is a competent juror.

APPEAL by defendant, Oscar F. Beckwith, from a judgment of the General Term of the Supreme Court in the Third Department, of 22d May, 1886, affirming a judgment of the Court of Oyer and Terminer of Columbia County convicting defendant of murder in the first degree.

The facts which are important for an understanding of the case are given in the opinion of the General Term. See 4 N. Y. Crim. Rep. 335 *et seq.*

*Levi F. Longley*, for defendant, appellant.

I. The trial court erred in refusing to set aside, on defendant's motion, the juror Abner A. New, after he was sworn and before evidence had been given in the case. The juror was in the employ of a corporate company of which the District Attorney was president, and defendant moved that

said juror be set aside. The District Attorney admitted that such was the fact, and said he was willing to submit the matter to the decision of the court.

Section 371 of the Code of Criminal Procedure provides as follows:

"A *challenge* must be taken when the juror appears and before he is sworn, but the Court may, in its discretion, for good cause, set aside a juror at any time before evidence is given in the action."

This provision in the Code devolves upon the Court a power which it is not only permitted but required to exercise in the interests of justice, (especially in a capital case,) where the case affords the opportunity.

But if the language of this section be regarded simply as vesting a discretionary power in the Court of Oyer and Terminer, the refusal of the Court to grant defendant's motion to set aside said juror is still a proper subject of review on appeal.

Referring to Sec. 349 of the old Code of Procedure, which, so far as it affects this question, is the same as Sec. 1347 of the present Code of Civil Procedure, in *Livermore* v. *Bainbridge*, (56 N. Y., 72.) The Court of Appeals say: "The jurisdiction of the General Term under this Section, to review orders made by the Special Term, in respect to matters resting in the discretion of the Court, *which involve substantial rights and interests*, has been constantly exercised, and has been sanctioned and approved by the Court. This jurisdiction is convenient, and is indeed essential to the proper administration of justice."

"Even in cases where the motion is addressed to the discretion of the Justice at the Special Term, an appeal lies to the General Term." *Jeffries* v. *McKillop & S. Co.*, 48 How., Pr. 122.

That this motion was made at the Oyer and Terminer and not at Special Term, will not probably vary the rule thus laid down, and this question involved substantial rights and interests.

One of the grounds of challenge for implied bias mentioned in the second clause of Section 377 of the Code of Criminal Procedure, is where the juror bears to the attorney or counsel for the people " the relation of master or servant."

II. Where, as in this case, there is evidence of an altercation and attack by the deceased upon the defendant, previous expressions of ill will on the part of the defendant, even if amounting to threats, will not alone furnish evidence that the homicide was committed in pursuance of a deliberate purpose. There must be some act of defendant indicating his purpose preceding the killing. This is an element upon which stress was laid by the courts in several recent cases. As in *People* v. *Hovey* 1 N. Y. Crim. 180, where the defendant purchased a pistol and loaded it. As in Sindram's case, 88 N. Y. 196, where the defendant sought out the deceased and fired one shot after another. As in Majone's case, 1 N. Y. Crim. 94, where, with weapon in hand, he pursued after is wife into another room.

As in Cornettis' case, 1 N. Y. Crim. 303 where the defendant first armed himself with a knife, and afterwards approached the deceased, and with it stabbed him to death. As in Leighton's case, 10 Abb. N. C. 261, the seeking out the deceased with a razor in his pocket.

In all these cases where bad blood or threats were shown, there was evidence of either preparation for the crime, or a seeking after, or pursuit of the victim.

In the present case, all the " seeking," all the " pursuit," all the " approaching," were on the other side. It is conceded Vandercook came to Beckwith's cabin. He was not invited there. He had no business there. No preparation was shown on the part of defendant, and no fact from which it could be inferred. 2 Starkie's Evidence, p. 948.

III. Without the testimony of the defendant, there was nothing before the jury to enable them to legally determine what grade of crime, if any, had been committed. They had, at most, only the fact that the deceased had probably come to his death at the hands of defendant, in the latter's own

cabin, where he had no known business, and the inference which defendant's flight perhaps furnished, that in such kill-ing he was not altogether innocent.

It was held in *People* v. *Stokes*, 53 N. Y., 164, that under the statute classifying homicide, mere proof that one has been deprived of life by the act of another, fails utterly to show the class to which the homicide belongs.

The conviction therefore to have had any legal basis must have rested on the defendant's own testimony taken and ac-cepted by the jury as true.

So that the question before this Court on this branch of the argument is the simple question of law, whether the facts thus substantially conceded and taken as true, in the courts below, constitute the crime of murder in the first degree.

" The prisoner may, in certain instances, extenuate his crime and reduce it from murder to manslaughter, by proof that the act was committed during a transport of passion and resentment, excited by sudden provocation, which for the time subdued his reason. For such evidence repels the in-ference of that deliberate malice and malignity of heart, which is essential to the offense (of murder.) * * * What de-gree of provocation and under what circumstances, heat of blood, the *furor brevis* will or will not avail the defendant, *is usually a question of law*, arising upon the special facts of the case." Roscoe's Cr. Ev. 964.

It is the *nature of the provocation* and not the mere effect of it on the mind of the prisoner, which the law regards, and the sufficiency of the provocation to extenuate the prisoner's guilt, *is a question of law*. If one kill another immediately upon a grave and serious provocation, likely to excite great passion, the offense will amount to no more than manslaughter, although the defendant used a deadly weapon. Ibid. 965.

" Where, after mutual combat, a question arises whether there has been time for excited passions to subside, the ques-tion always takes this form ; whether there had been suffi-cient time to cool, and not whether, in point of fact, the de-fendant did remain in a state of anger." *People* v. *Sullivan,* 7 N. Y., 400.

Had there been sufficient time for those passions to cool before the final blow with the axe, which it is claimed, made the defendant guilty of murder in the first degree?

That the question above quoted from Sullivan's case, is the controlling question in this case there can be no doubt.

The counsel claimed at the General Term that this question is clearly one of fact to be answered by the jury, and is not a question of law. Directly the opposite is laid down as the rule in 1 Russ on Crimes, pp. 524 and 525, where it is said, "whether the blood has had time to cool or not is a question for the Court and not for the jury." And in 2 Starkie's Evidence, pp. 947, 948, in speaking of the circumstances of "necessity, accident or infirmity," which justify, excuse or extenuate the act, the author uses the following language : " It is for the jury to pronounce upon the truth of such facts, and it is for the Court to decide whether in point of law the fact of killing is justified, excused or alleviated by these facts."

IV. There is no evidence of any time for passion to cool. Roscoe. Crim. Ev. 685 ; *Leighton* v. *People*, 88 N. Y. 117.

The fact that defendant endeavored to conceal the homicide, and failing in that fled, would ordinarily afford a basis from which to infer guilt, but his testimony reveals the fact that he imagined that all through life, he had been a victim of the hostility of the secret society of Free Masons. He testified that twice all his accumulations of property, amounting to about $1000 each time, had been swept away through their influence against him in courts of law, and when he found that Vandercook was dead, his first fear was the Masons.

But if guilt might properly be inferred from his conduct in this respect, it is respectfully suggested that a degree of guilt, sufficient to consign him to prison for his natural life (the penalty for murder in the second degree), was quite enough to infer, without going to the highest degree possible.

V. The trial court erred in refusing the request of defendant's counsel to direct the jury to reconsider their verdict.

The jury retired to enter upon their deliberations at one o'clock in the afternoon of Thursday, at eight o'clock of the same evening, they came in for instruction, were again sent out and only agreed on the next day. It is fair to presume that a verdict arrived at with so much difficulty, would not have been arrived at at all, but for some misapprehension of the law as to the effect of the " recommendation of mercy to the Court," incorporated by them in their verdict.

The Court did explain to them their mistake when it said, " The Court has nothing " to do with a recommendation to mercy," but refused to direct the jury to reconsider their verdict.

*B. Gardenier,* district attorney, for the people, respondents.

I. The killing was not manslaughter. The deadly intent which separates manslaughter from murder was present. The deadly grip upon Vandercook's throat, and the equally deadly axe leave no question of what Beckwith's purpose was.

It was said by Judge Andrews : A man is presumed to intend the natural consequences of his act. *Foster* v. *People,* 50 N. Y. 609 ; Phillips Ev. 632.

In *People* v. *Conroy,* 2 N. Y., Crim. Rep., 582, this court held : " Where the inferences to be drawn from the testimony are not clear and incontrovertible, and men of ordinary judgment and discretion might differ as to its significance, it is the exclusive province of the jury to pass upon the question involved." Citing *Thurber* v. *Harlem R. R. Co.,* 60 N. Y. 331 ; *Morrison* v. *Erie Railroad Co.,* 56 N. Y. 308.

Whether this crime was manslaughter, was submitted to the jury and decided adversely to the defendant.

II. The finding of the jury that the offence was murder in the first degree, is sustained by the evidence of the defendant himeslf.

FINCH, J.—That the prisoner killed the deceased by the blow of an ax he himself has testified. While the jury were

not bound to believe his account of the struggle and its origin, and might well have doubted it, as in many respects improbable and unreasonable, yet, if they gave it credence, it furnished, in connection with the other evidence, sufficient ground for the verdict which they rendered.

The argument before us was largely devoted to the point that the final blow was delivered at the close of a furious struggle and before sufficient time had elapsed for the prisoner's passions, engendered by the conflict, to subside and cool; and so the crime was manslaughter only. But that grade of homicide is marked by the important characteristic that there is no design to kill. If such purpose be present the offense is murder in one of its degrees. The evidence very clearly shows the existence of that design.

Granting all that the prisoner says of the struggle, yet it is apparent that while the blow of the knife might have been given in the heat of the affray, and without a purpose to kill, the blow of the ax admits of no such explanation. That was struck when the struggle had ended, and the victim lay paralyzed and unresisting. The knife had penetrated the lung, and weakened him perceptibly, and the prisoner had choked him until, to use his own expression, he was "about past recall," and then, with no danger remaining, his own personal safety assured, and abundant opportunity to escape from the cabin without injury, or hand the assailant over to justice, he nevertheless "let go" of his antagonist, rendered helpless and harmless, went after and obtained his ax, and with it ended the life not yet destroyed by the blow of the knife and the choking which followed.

The weapon was selected and the blow was struck with a palpable design to effect death. No other inference is reasonable. If we assume, what the evidence does not show, and the prisoner does not say or pretend, that the ax was near at hand and easily and swiftly grasped, and the knife had been dropped in the struggle, which also is wholly unproved, it is still true that the conflict was at an end and the prisoner himself says: "I let him go; I was afraid I had killed him."

That was a natural fear, and the presence of such an emotion, the shock of discovering that he had endangered the life of his adversary is quite inconsistent with the continuance of frenzy and rage. The passion of the fight was probably replaced by the fear of consequences naturally born of the condition of the deceased. Scarcely anything would cool the prisoner's anger more swiftly than the sight of the dying man on the floor and the consciousness of having perhaps killed him; for one strong emotion drives out another. That fear of consequences, he tells us, came into his mind and following it seems to have arisen an evident purpose to evade those consequences by making sure of the death of his enemy, and proceeding to mutilate and destroy the body, with a view to escape detection. And so the ax was wielded with a settled design to kill.

There was some degree, also, of premeditation and deliberation. The process of reasoning which the prisoner's own words suggest shows that he deliberated. He reflected enough to be conscious that his victim was in danger of death; enough to feel an emotion of fear for the consequences to himself; enough to decide that it was safer to finally kill him than run the risk of his recovery, or his death lingering and discovered; enough to select and choose the ax as the surest weapon, instead of the knife which he had already used; and then, having inflicted death, to proceed coolly to the logical end of his deliberation by burning so much of the body as could be identified, by taking from the pockets of the dead man whatever would reveal his name, by a thoughtful preparation for flight, by escape into Canada, and concealment under a false name. When he was asked why, when further violence was unnecessary for his own defense, he persisted in the work of killing his antagonist, he answered first that he did not know what he was about, but finally said: " I thought I had a right."

Ordinarily we are compelled to infer the intent from the nature and surroundings of the act, and these alone in this case would furnish a sufficient answer; but the prisoner him-

self reveals two of the thoughts that arose in his mind, and with their aid we can quite accurately ascertain the rest. As he looked upon the result of his action, there came a consciousness of what he had done, and with that consciousness a shock that would sober almost any rage. Then arose the fear that his victim might linger and die, and he himself be detected and punished. How to avoid that result was the natural sequence of his thoughts; and then came the other reflection of which he tells us, brutal and ignorant it may be, but with which he braced his nerves and hardened his courage for the final act: that he "had a right" to kill the man, who was not yet dead, and so avoid detection and punishment. Then followed the choice of a weapon. The knife which he had just used would naturally come first to his mind; but he either sees or remembers his ax and chooses that as the more effective weapon of the two, and possibly also because he had then in mind a mutilation of the body which would prevent identification. In all this there is very much more than impulse or an unreflecting blow. There is thought, choice and plan.

The rule as to deliberation and premeditation has been stated so often as to have become familiar. The time need not be long and may be short. If it furnishes room and opportunity for reflection, and the facts show that such reflection existed, and the mind was busy with its design and made the choice with full chance to choose otherwise, the condition of the statute is fulfilled. The jury were justified in their conclusion that there was a deliberate and premeditated design to kill, even though they credited the prisoner's account of the affray. But they may have disbelieved it entirely. Why should Vandercook, on finding the cabin door barred, proceed to force an entrance? What foundation was there for an accusation of poisoning? When Beckwith made that accusation Vandercook is represented as having admitted it, and as coolly expressing his regret that it failed of its purpose because Beckwith threw it off of his stomach. If there was any quarrel between these men it was about the mine; that was

their sole cause of hostility; and yet neither mentions it at all, or broaches the subject by a word. On the contrary, Beckwith calls Vandercook by an opprobrious epithet as far away as possible from the subject of difference, thereupon the latter, who had borne without emotion the charge of attempted murder, flames into a rage at being called a "whoremaster" and resorts to violence.

In relating what occurred, as a witness, the prisoner at first on his direct examination conceals the fact of a blow with the ax given after the close of the struggle, and confesses it only when pressed by the cross examination. After that blow he admits that he cut Vandercook's throat and pulled out his tongue. The atrocity of the act is here said to indicate frenzy; but the prisoner gives a different and very strange explanation, saying that it was "same as the masons do; that is the penalty they have to inflict on one another."

The answers that he made often had about them a tone of brutality, of cold unconcern; and the jury may very well have disbelieved his story of an affray and reached their conclusion with little trust in the prisoner's explanation. In that view of the case they had before them the quarrel about the ownership of the mine which had developed in the prisoner a considerable degree of hostility; his repeated threats to put his enemy out of the way, and his tempting another to murder, with the suggestion of the money to be gained from the man he hated; the opportunity offered by Vandercook's presence in the solitary cabin hidden in the ravine and little exposed to observation; the thrust of the knife indicating a blow struck from behind; the chopping of the body into fragments and burning whatever could be identified; the falsehood told to explain Vandercook's absence, and the final departure and flight; these facts taken together tend to the conclusion which the jury reached.

The grade of the crime was a question of fact for their determination acting under proper instructions as to the law. There is no complaint of those instructions, and the verdict rendered on the question of the fact it would be our duty to

respect, even if it bred in us a doubt—which we do not feel.

The request to discharge the juror, New, after he had been accepted and sworn, was by the statute within the discretion of the trial judge.   Code, Crim. Proc. § 371.

That discretion was not all abused, and if we were at liberty to review it, we should feel that it was not unwisely or improperly exercised.

Discovering no error in the record, our duty is to affirm the conviction.

The judgment must be affirmed.

All concur.

NOTE.—For a collection of the earlier cases upon deliberation and premeditation see 18, Am. Dec. 778 n ; 10 Cent. L. J. 370, 390.   For the recent decisions in this State upon the same subject see the following cases in this series: *People* v. *Majone,* 1 N.Y. Crim. 86, 94; *People* v. *Hovey, Id.* 180, 283; *People* v. *Cornetti, Id.* 303 ; *People* v. *Mongano, Id.* 411 ; *Sindram* v, *People, Id.* 448 ; *Daly* v. *People,* 2 N. Y. Crim. 159 ; *People* v. *Jefferson, Id.* 240 ; *People* v. *Conroy, Id.* 247, 565 ; *People* v. *Kiernan,* 3 N. Y. Crim. 247, 4 *Id.* 88 ; *People* v. *Jones,* 3 *Id.* 252 ; *People* v. *Willett, Id.* 324 ; *People* v. *Walworth,* 4 N. Y. Crim. 355 ; *People* v. *Druse,* 5 N. Y. Crim. 10.   The deliberation and premeditation need not exist for any particular length of time.   *State* v. *Hockett,* (Iowa, Dec. 1886), 30 N. W. Rep. 742.