STATE v. HENRY PROLOW.[1]

July 13, 1906.

Nos. 14,731—(29).

**Homicide—Presumption.**

Every homicide is presumed unlawful, and when the mere act of killing is proven it is presumed intentional and malicious.

**Same—Murder.**

When it clearly appears that the defendant deliberately and intentionally shot the deceased, the presumption is that it was an act of murder.

**Premeditation.**

Premeditation means thought of beforehand for any length of time, no matter how short. There need be no appreciable period of time between the conception of the intention and the act of killing.

**Evidence.**

The evidence in the case considered, and found sufficient to sustain the verdict.

[1]Reported in 108 N. W. 873.

Appeal by defendant from an order of the district court for Goodhue· county, Williston, J., denying a motion for a new trial, after a trial and. conviction of the crime of murder in the first degree. Affirmed.

*S. J. Nelson* and *J. C. McClure,* for appellant.

*Edward T. Young,* Attorney General, *Royal A. Stone,* Assistant Attorney General, *Albert Johnson,* County Attorney, and *Thomas Mohn,* for the State.

ELLIOTT, J.

On September 4, 1905, the defendant, Henry Prolow, while in the· saloon of Charles F. Zemke in the village of Goodhue, became involved in a controversy with certain parties. Zemke interfered and told the· parties that if they wished to fight they should go out of doors. The· defendant left the saloon and procured a revolver, after which he re-- turned to the place and became involved in a quarrel with the propri-- etor. He was ejected from the saloon, and thereupon shot and killed Zemke. He was indicted, tried, and convicted of the crime of murder· in the first degree, and appeals to this court from an order denying a. motion for a new trial.

The appellant assigns as error:

(a) The refusal of the court to set aside and vacate the verdict be-- cause the verdict was not sustained by the evidence in that it does not show express and premeditated malice.

(b) The charging of the jury that "the word 'premeditation' does. not mean calmly and deliberately revolving the proposition in his mind; but, no matter how short the time before the killing, if he made up his. mind to shoot and the shot did kill Mr. Zemke, then he premeditatively· fired the shot and he is responsible for all the results that followed."

(c) That "if you find from the evidence and beyond a reasonable· doubt that the defendant shot and killed Zemke as alleged in the indict- ment, and did so with premeditated design to [kill]. Zemke or another,. the defendant is guilty of murder in the first degree; and if you find from the evidence beyond a reasonable doubt that the defendant, at any time, moment, or instant before firing of the fatal shot, intended to· shoot and kill Zemke, that is sufficient evidence of premeditation. The· length of time it takes to form a man's opinion of what he will do in,

a situation like that is something that cannot be measured by minutes or seconds."

(d) That "premeditation may be formed at any time, moment, or instant before the killing. Premeditation means thought of beforehand for any length of time, no matter how short. There need be no appreciable space of time between the intention of killing and the act of killing. They may be as instantaneous as the successive thoughts of the mind."

1. These assignments may all be treated together, as they involve the question of what is necessary to prove the "premeditated design" which is an essential element of murder in the first degree.

(a) The statute (G. S. 1878, c. 94, §§ 2, 3) as it stood prior to 1885, and under which certain decisions to be referred to were made, defined murder as follows:

> Such killing when perpetrated with a premeditated design to effect the death of the person killed, or any human being, shall be murder in the first degree. * * *
>
> Such killing when perpetrated by any act eminently dangerous to one or more persons and evincing a depraved mind, regardless of the life of such person or persons, although without any design to effect death, shall be murder in the second degree.

In 1885 these definitions were changed to the form in which they now stand (G. S. 1894, §§ 6437, 6438; R. L. 1905, §§ 4876, 4877), namely:

> The killing of a human being, unless it is excusable or justifiable is murder in the first degree when perpetrated with a premeditated design to effect the death of the person killed or of another. * * *
>
> Such killing of a human being is murder in the second degree when committed with a design to effect the death of the person killed or of another but without deliberation and premeditation.

It will be seen that no material change was made in the definition of murder in the first degree. There must be a design to effect the death of the person killed and that design must be premeditated. In State v.

Brown, 41 Minn. 319, 43 N. W. 69, the court said: "The definition of murder in the first degree remains unchanged, and the character and degree of proof required to establish the guilt of an accused person under this section has not been changed by the code."

The evidence of malice may be found in the presumption which arises from the facts and circumstances of the intentional killing. The law presumes malice from the use of a deadly weapon. Brown v. State, 83 Ala. 33, 3 South. 857, 3 Am. St. 685; Underhill, Crim. Ev. § 320; Thompson, Trials, § 2532.

In State v. Brown, 12 Minn. 448 (538), Wilson, C. J., said: "Every homicide is presumed unlawful, and when the mere act of killing is proven, and nothing more, the presumption is that it was intentional and malicious." So in State v. Shippey, 10 Minn. 178 (273), 88 Am. Dec. 70, the court said: "It clearly appears that defendant deliberately and intentionally shot the deceased, and from this the presumption is that it was an act of murder. Com. v. York, 9 Metc. (Mass.) 93, 43 Am. Dec. 373. This presumption it was for the defendant to rebut." Deliberate and intentional homicide is presumptively murder. State v. Hanley, 34 Minn. 430, 26 N. W. 397: "Facts tending to qualify or palliate the intentional killing must be disclosed by evidence on the part of the defendant, if they do not appear from the evidence produced by the state." Com. v. Webster, 5 Cush. 295, 52 Am. Dec. 711.

In State v. Lautenschlager, 22 Minn. 514, an instruction that "the law presumes a premeditated design from the naked fact of killing" was approved. In State v. Brown, 41 Minn. 319, 43 N. W. 69, this case is cited to the proposition that, "where there are no circumstances to prevent or rebut the presumption, the law will presume that the unlawful act was intentional and malicious and was prompted and determined on by the ordinary and natural operations of the mind."

The instructions to which the appellant excepts were approved in State v. Brown, supra, and State v. Lentz, 45 Minn. 177, 47 N. W. 720. In the former case Mr. Justice Vanderburgh said: The law "cannot define the length of time within which the determination to murder or commit the unlawful act resulting in death must be formed. There is a great difference in the character of men in respect to habits of thought and action, as well as to self-restraint and sense of moral obligation, and persons who have become depraved through evil habits and as-

sociations are generally reckless of restraint and ripe for crime. Such men will hesitate but little to commit desperate acts, and will act quickly under slight temptation and from motives which would fail to influence others. We cannot measure the celerity of mental processes, and whether, in a case of homicide, a premeditated design to kill was formed, must, where the question can arise at all, be left to the jury to determine from all the circumstances."

In People v. Beckwith, 103 N. Y. 360, 8 N. E. 662, Mr. Justice Finch said: "The rule as to deliberation and premeditation has been stated so often as to have become familiar. The time need not be long and may be short. If it furnishes room and opportunity for reflection and the facts show that such reflection existed and the mind was busy with its design, and made the choice with full chance to choose otherwise, the condition of the statute is fulfilled."

In People v. Callaghan, 4 Utah, 49, 6 Pac. 49, the court said: Regarding premeditation, it is not error to instruct the jury that "there may be no appreciable space of time between the intent to kill and the act of killing. They may be as instantaneous as the successive thoughts of the mind." See also People v. Nichol, 34 Cal. 211, and People v. Hunt, 59 Cal. 430.

Wharton, Crim. Law (10th Ed.) § 380, says: "It is not necessary however that this intention should have been conceived for any particular period of time. It is as much premeditation if it entered into the mind of the guilty agent a moment before the act as if it entered ten years before." See 1 McClain, Crim. Law, § 358; 6 Words & Phrases, 5505, and authorities cited under sub-topic "Time as an Element of."

We proceed, then, to an examination of the evidence, bearing in mind that ordinarily premeditation is not capable of direct proof, but may be inferred from the circumstances of the case, such as ill will, previous threats, previous difficulties between the parties, preparation for taking life, the possession of a deadly weapon, and the mode by which it was obtained, searching for the party, lapse of time after provocation, declarations made after the killing, and other such matters.

(b) The defendant, Prolow, was a strong, vigorous man, who had, for some time prior to the homicide, been working on a farm near the village of Goodhue. On September 4 he came to the village and went directly to the saloon of Charles Zemke, where he left his valise until

such time as he should call for it.   From his arrival in the village until the shooting he spent the time about town and in the saloons.   On September 4, between three and five o'clock in the afternoon, he went to Zemke's saloon, where he found a number of men drinking and amusing themselves.   Among those present were Zemke, the proprietor, Skramstad, and a person called "Slim," with whom Prolow seems to have had some acquaintance.   "Slim" was to such an extent under the influence of liquor that he was dancing about the room and entertaining the crowd.   He finally approached Skramstad with the remark that he was going to "lick" some one in Goodhue county that day.   After some boasting Skramstad gave "Slim" a shove which threw him to the floor. Prolow then remarked that it was not a very nice way to treat a person, and that he would like to see any one in Goodhue county who could do that to him.   Skramstad replied that he thought he could do the same to Prolow.   Others interfered, encouraged Skramstad, and offered to wager money that he could knock Prolow down.   The crowd seems to have shown a disposition to "pick on" Prolow, who declined to fight because, as he said, there were too many people in the case.   Skramstad said: "You are nothing but a big stiff."   At about this point Zemke came from behind the bar and said that he did not allow any fighting there; that if they wanted to fight they must get out of doors.   According to the testimony of some of the witnesses, Zemke spoke principally to Prolow, as though he were the chief offender.   Some words passed between them, and Zemke told Prolow to "shut his mouth" or get of the room.   Prolow went to a chair and sat down, and soon thereafter left the room.   It appears very clearly that when he left the place he felt that he had been imposed upon and badly treated by Zemke and the others.

Soon after leaving the saloon, Prolow went to a hardware store and attempted to purchase a revolver.   The proprietor for some reason refused to sell him one.   Soon after he went to another store and purchased a revolver and a box of cartridges.   Prolow testified that he intended to go out threshing and wanted the revolver to shoot at marks and otherwise amuse himself with.   While in the hardware store he loaded the weapon, saying: "Now I am going to shoot some dogs." After leaving the store he looked in at two saloons, and then went to Zemke's place and sat down in a chair.   The evidence is somewhat con-

flicting as to what occurred immediately thereafter. But it is sufficient to justify the jury in finding that, soon after he entered, Prolow said to Zemke: "You said this morning that I was the best man in Goodhue county." Zemke "sort of smiled" and said he had not done so. Prolow then said, "You are a —— damn liar." Zemke left his seat and went directly to Prolow, seized him by the coat collar in front, threw him from the chair, and dragged him out of the saloon and onto the sidewalk. Prolow claimed that Zemke caught him in such a manner and choked him, so that, although he appears to be a large, strong man, he was unable to resist. As soon as he was released, he turned around and said, "Don't you do that again," drew his revolver, and, taking aim, fired four shots in rapid succession. The defendant claims that Zemke had hold of him when he commenced shooting; but all the eyewitnesses testify that Zemke was then standing from three to six feet away, and from all the circumstances it is reasonable to believe that when Zemke threw Prolow on the sidewalk he turned his back on him and started to return to the saloon. Possibly he was still facing Prolow when the first shot was fired, which passed through his arm. But it is certain that the other three shots were fired after he was attempting to escape for they all entered his back within a few inches of each other. One bullet pierced the heart and came out through the breast; the other lodged in or near the heart. Any one of the three shots was sufficient to cause death. A fifth shot was fired at random into the street. Prolow was immediately arrested by the village marshal. On the way to the lockup the marshal asked him why he had shot Zemke, and he replied that "they have been trying to run on me down there this afternoon; they can't do it."

We are satisfied that there is evidence in the record sufficient to sustain the finding of the jury that Prolow entertained a premeditated design to kill Zemke. The quarrel in the saloon left him with the sense of having been imposed upon and badly treated. This clearly appears from the remark made by him after the shooting. He went almost immediately in search of a revolver, and spent nearly one-half of his money for the weapon and ammunition. The remark that he was now going out to shoot some dogs is susceptible of a double meaning. Instead of going after dogs, he returned to Zemke's saloon, as he says, for the purpose of getting his valise; but his conduct after reaching

there is not consistent with this story. His demeanor in the afternoon was not such as to leave the impression that he was a man of much courage. His manner changed when he returned with a deadly weapon in his pocket. He promptly opened the subject, and called Zemke a liar, with the usual accompanying adjectives. Although a strong man, he was evidently intimidated by Zemke's attack, and was dragged out of the saloon without much resistance. It is possible, however, that, as he says, Zemke caught hold of him in such a manner as to deprive him of the power of resistance. When Prolow arose from the sidewalk the attack was over, and there was no possible justification for resorting to a deadly weapon in order to protect himself from injury. Instead of allowing matters to rest, Prolow straightened himself up, drew his revolver, took aim at Zemke, and fired the shots in rapid succession. The witnesses say it was done very rapidly, but the jury might well conclude that a man who was able to fire three shots from a self-cocking revolver into a man's heart must have had good control over his mind and nerves. It was not random shooting. The fact that the three shots all entered Zemke's back shows conclusively that he was at the time fleeing from his assailant. The first shot, which passed through his arm, may possibly have been fired while Zemke was still facing Prolow; but it did little damage. The fact stands out clearly that Prolow fired three shots into the back of a fleeing man. It was skilful and deadly shooting, and the jury was justified in finding that Prolow had ample time, even after he drew the revolver, to form the premediated design to kill Zemke.

2. The evidence fell far short of showing that the shooting was done in self-defense. The defendant claims that he began firing while Zemke still had hold of him; but it is preposterous to claim that it was necessary, or that he could have thought that it was necessary, to save himself from bodily harm, to fire three shots into the back of a fleeing man. The claim of self-defense was, however, fairly submitted to the jury under proper instruction.

3. Counsel for the appellant asserts that nowhere in the charge did the court call attention to the assault which had been made by Zemke on Prolow. This feature of the case does not appear to have been made very prominent, doubtless because the defense placed its chief reliance upon the theory of self-defense. But the court defined the dif-

ferent degrees of homicide in the language of the statute, and instructed the jury that

> If you find from the evidence that the defendant Prolow, by means of the weapon described in the indictment, killed Charles Zemke, and that the killing was done in the heat of blood or passion and upon reasonable provocation, that such action or killing was intentional, and would further find that it was not excusable or justifiable, then the defendant is guilty of manslaughter in the first degree.

No other instructions were asked for.

We have given all the questions raised by the assignments of error the careful consideration which a case of so much importance demands, and we find no errors which require a reversal of the order of the trial court.

Order affirmed.