STATE of Minnesota, Respondent,

v.

Andrew JOHNSON, a.k.a. Andre Brown, Appellant.

No. 45955.

Supreme Court of Minnesota.

July 1, 1977.

C. Paul Jones, Public Defender, Roger H. Hippert, Asst. Public Defender, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., St. Paul, Gary W. Flakne, County Atty., Vernon E. Bergstrom, Chief, Appellate Division, and David W. Larson and Phebe S. Haugen, Asst. County Attys., Minneapolis, for respondent.

Heard before SHERAN, C. J., and OTIS, ROGOSHESKE, PETERSON, KELLY, SCOTT and STAHLER, JJ., and considered and decided by the court en banc.

ROGOSHESKE, Justice.

Defendant, Andrew Johnson, was found guilty by a Hennepin County jury of murder in the first degree upon an indictment charging him with the premeditated killing

**282**

of Yvonne (Bonnie) Bye. Minn.St. 609.185.[1] On this appeal, defendant, arguing that at most a conviction of a lesser degree of homicide was warranted, raises three principal claims of error: (1) The admission into evidence of a tape-recorded statement and incriminating diagrams despite the state's failure to supply defendant with copies of this evidence in compliance with Minn.St. 611.033; (2) the trial court's refusal to grant defendant a continuance in order to allow further psychiatric examination of the prosecution's chief witness to determine her competency; and (3) improper admission of evidence relating to other criminal offenses committed by defendant shortly before the murder of the victim.[2] In adherence to the principles expressed in *State v. Beach,* 304 Minn. 302, 231 N.W.2d 75 (1975), we hold that it was error for the prosecution to introduce defendant's tape-recorded statement and drawings without first satisfying the requirements of § 611.-033, but that this error was harmless beyond a reasonable doubt. Finding no merit in defendant's remaining contentions, we affirm his conviction.

Viewing the evidence most favorably to support the conviction of first-degree murder, the jury could find these facts. On the afternoon of August 23, 1974, two young boys found a badly decomposed body near an abandoned pumphouse while searching for golf balls near the Edenvale golf course in Eden Prairie. Law enforcement officials arrived shortly thereafter along with Dr. Gary Peterson, deputy Hennepin County medical examiner. Because of severe decomposition, it was impossible to identify the victim. Besides retrieving the body, the law enforcement officers found nearby a small spoon, a roach clip, a silver necklace, and a knife blade without a handle. The following day, Roxanne Bye, prompted by a newscast of the incident of finding the body

and her knowledge of her sister Bonnie's unexplained absence since August 15, called the medical examiner's office. Subsequently, Dr. Peterson, by use of dental records, was able to establish conclusively that the victim was in fact Bonnie Bye.

On the day before her death, August 14, Bonnie Bye, then age 18, first met 17-year-old Faith Daehlin. That evening both young women worked in St. Paul as prostitutes for defendant, age 24. At around midnight both women and defendant returned to Bonnie's apartment to spend the night. Three other young friends of Bonnie's, Thomas Koenig, his brother Joe, and Daniel Wann, also slept in her apartment as they had been doing for the preceding several weeks. Bonnie appeared very nervous and upset throughout the evening because she was in need of amphetamines and disliked working as a prostitute.

The next morning Bonnie was still visibly upset and threatened to commit suicide several times, thereby greatly irritating both defendant and Faith Daehlin. At around 2 p. m. Bonnie and her sister, Roxanne Bye, visited their mother in the hospital, while defendant and Faith remained with Roxanne's two small children. Roxanne later that day entered the hospital to deliver a child by Che Che Brown, defendant's brother.

By early afternoon Bonnie had rejoined Faith and defendant. The three returned to Bonnie's apartment at around 4 p. m., and while defendant and Faith waited in defendant's car, Bonnie went inside to pick up some clothes and a check. Tom Koenig, one of the sleep-in guests, noticed during defendant's absence that his shoes were missing. When Bonnie returned to the car, Tom followed along with Daniel Wann to ask defendant what had happened to the shoes. Defendant denied knowing where the shoes were even though they were visi-

1. Minn.St. 609.185 provides: "Whoever does either of the following is guilty of murder in the first degree and shall be sentenced to imprisonment for life:

"(1) Causes the death of a human being with premeditation and with intent to effect the death of such person or of another * * *."

2. Without commenting in detail, we find no merit in defendant's additional claim that the trial judge hastened the verdict by alleged prejudicial remarks to the jury prior to deliberations.

ble on the front seat floor. When Tom persisted in his demand to return his shoes, defendant, removing a .22-caliber rifle from the car trunk, threateningly chased the two young men back into the apartment. Meanwhile, Bonnie had sat down on the passenger side of the front seat. Distressed by these events, Bonnie attempted to get out of the car but was restrained by Faith, who pulled Bonnie's hair and held a small-caliber pistol to her head.

By this time it was apparent that Bonnie's relationship with defendant and Faith was rapidly deteriorating. After the two young men had retreated to the apartment, they observed defendant's car drive off, only to return a few seconds later. Bonnie was then observed swinging her arms at defendant in the car. All three then exited the car while Bonnie continued to plead frantically with defendant to return the shoes as they were reentering the apartment.

Within 5 minutes, the trio left and drove off again, this time to cash the check that Bonnie had previously taken from the apartment. After Bonnie cashed the check, defendant took the money and refused to return it. This greatly agitated Bonnie, since the money was apparently her mother's, and again she talked of killing herself. The three then proceeded to a bar, where Bonnie remained while Faith and defendant went on to Roxanne Bye's house. Here they met defendant's brother, Che Che, who was then awaiting word from the hospital concerning the delivery of Roxanne's baby. Che Che, Faith, and defendant finally departed for the hospital at around 6:30, stopping en route to pick up Bonnie, who was still at the bar. When Bonnie at first refused to get into defendant's car, a fight erupted between the two women, with Faith ultimately prevailing over Bonnie by pushing her inside.

After Che Che was dropped off at the hospital, the other three lingered in the parking lot. Defendant then told Faith and Bonnie that he wanted to take them to Omaha, Nebraska, to "work," declaring it a good city for prostitution. Bonnie objected, assigning her mother's hospitalization as the reason. Nevertheless, the three returned to Roxanne's house at approximately 8 p. m. and began packing. Bonnie continued to be extremely upset despite defendant's efforts, at Faith's direction, to console her. It was also during this time, however, that defendant told Faith of his distrust of Bonnie and declared they "would have to get rid of her." Prior to leaving defendant searched for his rifle and, failing to find it, had Faith take a large bread knife owned by Roxanne to the car.

By 9 p. m. the packing had been completed, and the three departed to find some "tricks" at a nightclub in the suburbs. En route to their destination, when Bonnie was not looking, Faith allegedly mouthed the words to defendant, "Boy, would I ever like to kill this bitch." He responded, "That is what we are going to do." When it became evident that defendant was not proceeding to the nightclub, Bonnie asked where they were going and Faith responded that they were first going to stop and have a talk. Defendant then drove to a secluded area near the Edenvale golf course in Eden Prairie, where all three got out of the car. At this point defendant motioned to Faith to bring Roxanne's bread knife and she, concealing the weapon, complied. The three then walked to a nearby pumphouse, where Faith asked Bonnie if she would be willing to go to Omaha. Again she refused to go. Defendant then grabbed Bonnie from behind and instructed Faith, "Do it now." Faith pulled out the bread knife and drew it across Bonnie's neck. Bonnie pleaded with Faith and defendant to desist and, in her struggling, managed to pull all three to the ground. Defendant, frustrated by Faith's lack of proficiency, then withdrew his own smaller knife and stabbed Bonnie in the throat. In the process the knife handle broke off, forcing defendant to complete his deadly task by pushing the blade into Bonnie's throat with the palm of his hand. As the two survivors were leaving, Bonnie inexplicably began to moan, and Faith returned to stab her again with the bread knife.

Faith and defendant then departed, leaving behind the roach clip, spoon, and chain necklace which were found when Bonnie's corpse was retrieved the following week. They first stopped at a lake near Faith's parents' home, where they washed their blood-stained hands and concealed the murder weapons in some weeds. Thereafter, they set off for Omaha, traveling via South Dakota. Somewhere west of Sioux Falls the fugitives abandoned their bloody clothes, and sometime later defendant was arrested for speeding and driving while intoxicated. After being detained for about 4 hours and paying a fine, they proceeded to Omaha, where they remained for 2 days while Faith engaged in prostitution to pay their hotel expenses. On August 18, defendant abandoned the car and he and Faith traveled by bus to Chicago, where they stayed for approximately 1 week with another brother of defendant.

During this interim Faith telephoned her parents in Minnetonka on two occasions and claimed that she was being held by defendant against her will. As a result of the first of these calls, a warrant was issued on August 23 in Minnetonka for defendant's arrest on a charge of false imprisonment. Meanwhile, evidence was mounting that defendant had been involved in a crime far more serious than false imprisonment, for following discovery of Bonnie's body on August 25, it was learned that she had last been seen alive with Faith and defendant. In the early morning hours of August 26, Faith and defendant were finally arrested by Cook County sheriffs.

Upon learning of the fugitives' apprehension, two detectives from the Hennepin County sheriff's department immediately departed for Chicago and were later joined by Detective Archie Sonenstahl. While in Chicago, defendant agreed to give a tape-recorded statement to Detective Sonenstahl. After being fully advised of his constitutional rights, defendant related many of his activities during the preceding days but specifically denied any complicity in the death of Bonnie Bye, claiming that she had died solely at the hand of Faith Daehlin. At this time defendant also made two drawings of the murder weapons and a map depicting where he had abandoned the car in Omaha. Faith and defendant were then flown back to Minneapolis. Defendant was again interviewed by Detective Sonenstahl the following day and, after again denying any criminal involvement, finally fully confessed to Bonnie Bye's murder.

Defendant was subsequently indicted by a grand jury for first-degree murder. The principal evidence introduced by the state during trial was defendant's two statements and the testimony of Faith Daehlin. On the sixth day of trial the jury returned a verdict of guilty, and defendant was forthwith sentenced to life imprisonment.

Defendant initially claims error for the trial court's pretrial refusal to suppress his first tape-recorded statement made in Chicago and the three drawings which depicted the murder weapons and the place where he had abandoned his car in Omaha. The admissibility of self-incriminating written evidence is governed by Minn.St. 611.033, which provides:

"No statement, confession, or admission in writing shall be received in evidence in any criminal proceeding against any defendant unless at the time of the taking thereof such defendant shall have been furnished with a copy thereof and which statement, confession, or admission shall have endorsed thereon or attached thereto the receipt of the accused which shall state that a copy thereof has been received by him."

It is undisputed that defendant was not given copies of the taped statement nor the drawings, and in addition, the state did not obtain his endorsement.

The state now concedes, and we hold, that it was error for the trial court to admit the tape-recorded statement as evidence in light of State v. Beach, 304 Minn. 302, 231 N.W.2d 75 (1975). This case, decided 6 months after the instant trial, involved the admissibility of two tape-recorded statements made by defendants in a prosecution for bribery. At pretrial, the trial court suppressed the tapes for failure to

comply with the requirements of § 611.033 and further disallowed use of the tapes for the limited purpose of refreshing the memory of the witness who had interviewed the defendants. On appeal, we affirmed the suppression of the tapes, finding that such tapes were "writings" within the contemplation of the statute. In requiring the state to furnish copies of the tapes to the defendants and to obtain their endorsement, we were careful to point out that the bar to admission of the tapes was statutory only, hence there was no constitutional impediment to using the tapes to refresh the memory of the witness who had questioned the defendants.

■ For similar reasons we hold that the drawings made by defendant were "writings" within the meaning of § 611.033, and that it was error for this evidence to be admitted when the state had neither given defendant copies nor secured his endorsement. There is no doubt that these diagrams incriminated defendant by linking him to the murder weapons, the scene of the crime, and the escape route. As such, this evidence was a part of his confession in the same sense as the words used to describe his criminal involvement. Moreover, one of the underlying legislative policies of the statutory requirements is to ensure the accuracy of written statements that are used to inculpate an accused.[3] Any argument that verbal evidence must meet a higher standard of accuracy than pictorial evidence has no logical merit. Finally, the state has articulated no reason why it would be more difficult to furnish the accused with a mechanically reproduced copy of a drawing than it presently is to supply him with a duplicate copy of a written confession or tape recording.

■ Notwithstanding the fact that both the taped statement and drawings were erroneously admitted, we unhesitatingly hold that the error was harmless beyond a reasonable doubt. *Milton v. Wainwright,* 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972). Defendant makes no claim that his constitutional rights were in any way violated, and the record establishes that he was adequately advised of his *Miranda* rights. Apart from the taped statement given in Chicago, in which defendant did not directly admit complicity in Bonnie Bye's murder, the state properly introduced another confession obtained the following day in which he did confess to the crime. This independent and considerably more damaging second statement, along with the overwhelming testimony of Faith Daehlin, greatly attenuated the statutory error arising from the admission of the first statement. Also significant is the fact that had the trial court properly held the first statement inadmissible Detective Sonenstahl, who had secured both confessions, could have orally supplied the same evidence by using the tape as a refreshing memorandum.

Defendant next challenges the court's refusal to grant a continuance in order to complete an additional psychiatric examination of Faith Daehlin when it became known that she was going to be called as the state's chief witness. Prior to defendant's trial, Faith was indicted for first-degree murder and had entered a plea of not guilty by reason of insanity. Although she had been examined by two doctors, her trial had been temporarily stayed pending a third psychiatric report. Upon learning that Faith was going to testify, defendant immediately moved for a continuance, claiming that he needed the results of the third examination for possible impeachment. Defendant now urges that his Sixth Amendment right to confrontation was unconstitutionally impaired.

■ While § 595.02(6) precludes "persons of unsound mind" from testifying in criminal prosecutions, it is well established that

---

**3.** In a sense, the statute also promotes discovery, although under Rule 9, Rules of Criminal Procedure, the accused would be entitled to make copies of written inculpatory evidence even without the provisions of § 611.033. That the legislative purpose of § 611.033 is not limited to discovery can be seen from § 480.059, subd. 7(b), which expressly prohibits modification of the statute by the rules.

the ultimate question of competency must be decided by the trial judge. As best explained in *State ex rel. Dugal v. Tahash,* 278 Minn. 175, 177, 153 N.W.2d 232, 234 (1967):

"Determination of a person's competency as a witness is within the sound discretion of the trial court and is ordinarily made by such preliminary examination of the proposed witness as may be deemed necessary by the court. If it appears from the examination that the witness understands the obligation of an oath and is capable of correctly narrating the facts to which his testimony relates, the witness is competent in fact and should be permitted to testify."

See, also, *State v. Lasley,* 306 Minn. 224, 236 N.W.2d 604 (1975); *State v. Whelan,* 291 Minn. 83, 189 N.W.2d 170 (1971). Similarly, our prior decisions have vested in the trial judge broad discretion to determine when and under what circumstances a continuance should be granted. The denial of a continuance will only be reversed on appeal where "the defendant has been in some manner embarrassed or prejudiced in preparing his defense so as to materially affect the outcome of the trial." *State v. Huber,* 275 Minn. 475, 481, 148 N.W.2d 137, 142 (1967).

In accord with these principles, the trial judge, as authorized by § 595.06, painstakingly questioned Faith Daehlin the day before she was to testify. He specifically asked her whether she comprehended the oath she would be required to take and whether she had the ability to recollect accurately the facts that had transpired at the time of the crime. The trial judge then possessed two psychiatric reports, one of which indicated that Faith's memory was satisfactory and that she had an IQ of approximately 120. The record further reveals that the testimony actually given by Faith was both lucid and, with few exceptions, remarkably consistent with that given by defendant at trial. While a third psychiatric report may have shed some additional light on the mental competency of Faith, we find that the trial court's refusal to grant a continuance was not an abuse of discretion and did not materially affect the outcome of defendant's trial.

Defendant finally claims that it was reversible error for the state to introduce evidence relating to criminal offenses allegedly committed by him shortly before the death of Bonnie Bye. Specifically, defendant committed a felonious assault by pointing a rifle at Tom Koenig and Daniel Wann in violation of § 609.225, subd. 2, and a misdemeanor by his refusal to return Tom Koenig's shoes. § 609.52, subd. 3(5). In addition, defendant asserts that he was not properly notified prior to trial of the prosecution's intent to introduce this testimony as required by *State v. Spreigl,* 272 Minn. 488, 139 N.W.2d 167 (1965).

It is a fundamental principle of evidentiary law that the prosecution may not introduce evidence of other crimes committed by a defendant to prove his bad character. *State v. Diamond,* Minn., 241 N.W.2d 95 (1976); *State v. Flowers,* 262 Minn. 164, 114 N.W.2d 78 (1962). Engrafted to this general exclusionary rule are a number of exceptions which permit evidence of other crimes to be received for the limited purpose of establishing motive and intent. *State v. Saucedo,* 294 Minn. 289, 200 N.W.2d 37 (1972); *State v. Sweeney,* 180 Minn. 450, 231 N.W. 225, 73 A.L.R. 380 (1930).

While it is true that in cases such as this the accused is to be given the benefit of the doubt, ultimately the decision to admit or reject evidence of other crimes rests in the sound discretion of the trial judge. *State v. Dinneen,* 300 Minn. 354, 220 N.W.2d 292 (1974). We are persuaded from a review of the present record that this discretion was not abused. Defendant's actions against the two boys first greatly provoked Bonnie. When she tried to exit the car and intercede in what was taking place, she was physically restrained by Faith Daehlin at gunpoint. After defendant reentered the car, Bonnie began swinging at him and was described by Faith as "frantic." All of these circumstances, taken together, not only showed a highly strained relationship but also helped to es-

tablish a motive and a premeditated intent on the part of defendant to kill Bonnie. Finally, since the collateral crimes bore directly on the relationship between defendant and Bonnie Bye existing immediately prior to her murder, it was unnecessary for the state to give him a "*Spreigl* notice" prior to seeking admission of this evidence. *State v. Martin*, 293 Minn. 116, 197 N.W.2d 219 (1972); *State v. Boyce*, 284 Minn. 242, 170 N.W.2d 104 (1969).

Affirmed.