STATE of Minnesota, Respondent,

v.

Ramon FLORES, Appellant.

No. CX–87–871.

Supreme Court of Minnesota.

Jan. 15, 1988.

C. Paul Jones, State Public Defender, Michael Cromett, Asst. Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Minnesota Atty. Gen., St. Paul, Marcy S. Crain, M. Katherine Doty, Asst. Co. Atty., Anoka, for respondent.

## OPINION

POPOVICH, Justice.

Ramon Flores was convicted of murder in the first degree in connection with the shooting death of Kalen Ortenblad, in violation of Minn.Stat. § 609.185(1) (1986), after a jury trial in Anoka County District Court, and was sentenced to life imprisonment. On appeal, appellant alleges (1) the trial court's jury instructions regarding premeditation and intoxication were erroneous; (2) there was insufficient evidence to support a conviction of murder in the first degree; and (3) the trial court committed reversible error with regard to three evidentiary rulings. We affirm.

At the time of the offense, appellant lived with his girlfriend, Betty Ortenblad, in her home in Ham Lake, Anoka County, Minnesota. They met in 1983 at a meeting of divorced and separated people and began dating. Appellant moved into her home in August, 1985, with two of his children from his previous marriage, Melanie, aged 19, and Ramon, Jr., aged 16. Ortenblad's son, Kalen Ortenblad, aged 20, was also living in the house at that time.

Appellant and Ramon, Jr., moved out in January, 1986, as a result of strained relations between Betty Ortenblad and appellant's son. Melanie Flores stayed and Kalen Ortenblad moved out, joining the United States Navy in February, 1986. Appellant and his son moved back in July, 1986. Shortly thereafter, a friend of Melanie's, Kimberly Bever, moved into the house and occupied the bedroom that had been used by Kalen. In late July, 1986, Kalen Ortenblad returned home on leave from the Navy.

On Wednesday, July 30, 1986, the day of the shooting, appellant, Betty Ortenblad, Melanie Flores and Kim Bever each went to work. Betty Ortenblad was the first to arrive home, about 4:00 p.m. Appellant returned home about 4:20 p.m. Appellant complained to her about an incident that had occurred two nights earlier where Kim, Kalen and a friend had awakened appellant and Betty Ortenblad with loud talking and noise late in the evening.

Kim Bever arrived home about 6:30 p.m. She spent approximately two hours packing things in the bedroom in the lower portion of the house. She observed appellant drinking beer when she arrived home but testified he did not appear intoxicated then.

Kalen Ortenblad spent the day with friends. During the afternoon Kalen and a friend, Pete Chouinard, went swimming in the Rum River. After swimming, Kalen and Chouinard drove to the Ortenblad residence so Kalen could change clothes. When they arrived, appellant, Kimberly Bever and Betty Ortenblad were at home. Kalen and Chouinard spent approximately 20 minutes at the house. During this time, Betty Ortenblad reprimanded appellant in the presence of Kalen and Chouinard for using profanity. Betty Ortenblad testified at trial this made appellant angry.

While Kalen was out of the room, Chouinard had a conversation with appellant. Appellant told Chouinard he was tired of people stealing things from the house and

if certain of Kalen's friends came over to the house without Kalen being present appellant would "cut their balls off." After Kalen returned, appellant encouraged Betty Ortenblad to inform Kalen of an incident that had occurred in the Bahamas. Betty Ortenblad testified her feelings were hurt by Flores' attempt to mention the incident, which she considered confidential. Kalen stated he did not want to hear about the incident.

Kalen then drove Chouinard home. The two planned to meet around 11:00 p.m. to "party." Kalen then apparently drove to the home of his friend Mike Kuehn and then to Coon Lake to meet two girls they had planned to take out later in the evening. The girls were not at home so Kalen and Kuehn went to a liquor store and then to a SuperAmerica station where Melanie Flores worked. After visiting with Melanie, Kalen and Kuehn made a second trip to a liquor store about 10:00 p.m. Kalen and Kuehn then drove to the Ortenblad home so Kalen could get more money. Kalen parked in the driveway and turned off the ignition, but asked Kuehn to stay outside in the truck.

About 8:30 p.m. while Kalen was away, Kim Bever, after packing her things, got in her car to go to her parent's house. Appellant came out while she was sitting in her car and complained people were not listening to him. He then picked up a two-by-four and struck Betty Ortenblad's car with it two or three times.

Kim Bever returned about 9:30 p.m. and resumed packing. Appellant and Betty Ortenblad were the only other people at home. As Bever was packing, appellant came and spoke to her about the argument he had had with Betty Ortenblad earlier in the day regarding his use of profane language. Appellant became angry as he spoke. Bever attempted to change the subject by asking him about a door to be used for remodeling of a bathroom. Appellant became angry and pulled a rifle from beneath a couch in the family room, pointing it at the door and asking Bever if she wanted to see him shoot it. Bever informed appellant she did not, and he put the rifle back under the couch. Bever returned to her packing while appellant continued to speak to her and continued to appear angry. Bever testified at trial that at this time appellant appeared more intoxicated than she usually saw him. This testimony was impeached by the testimony of Anoka County Deputy Sheriff Alan Yauk, who testified that immediately after the murder Bever stated appellant was no more intoxicated than usual.

As appellant was speaking to Bever, Kalen returned home and entered the hallway where they were speaking. Appellant had his back to Kalen. When Bever greeted Kalen, appellant immediately turned around and yelled several times for Kalen to get his "fucking friends out of here." Kalen was alone at the time. Kalen glared at appellant and punched the wall and a door. Betty Ortenblad came into the room and told appellant to "shut up and get out." Appellant went upstairs and Kalen went to the bedroom in which Kim was packing and got two $20 bills. He left the bedroom and walked to the landing of the stairway as appellant came back downstairs.

There was conflicting testimony as to what occurred next. At trial, Betty Ortenblad testified appellant shot Kalen in the stomach as appellant tripped while descending the stairs. She testified further that after Kalen fell forward onto the floor, appellant stumbled again and the gun discharged, striking Kalen two or three more times as appellant attempted to regain his balance.

Betty Ortenblad's testimony was impeached by several law enforcement officers who testified she had previously described the shooting in a manner inconsistent with her trial testimony. Anoka County Deputy Sheriff Alan Yauk testified that shortly after the shooting Betty Ortenblad told him appellant shot Kalen. She said as Kalen lay on the floor moaning appellant fired two or more shots into his back, and she did not mention appellant's stumbling on the stairs. Investigator Rolland Johnson also testified Betty Ortenblad failed to mention appellant's stumbling in the de-

scription of the shooting she gave to him shortly after the incident.

Betty Ortenblad gave two formal statements to police after the incident. Investigator Terry Larkin testified that in an interview approximately two hours after the shooting Betty Ortenblad stated appellant came down the stairs, shot Kalen in the abdomen and, after Kalen had fallen to the floor, stood over him and fired two or three more times into his back. At 10:20 a.m. on July 31, 1986, Ms. Ortenblad gave a similar statement to Investigator David Pecchia of the Anoka County Sheriff's Office. In neither statement did she mention appellant's stumbling on the stairs, nor was it mentioned when she testified before the grand jury.

Immediately after the shooting, Betty Ortenblad called the police. Appellant left the house and drove away in her car. About 3:00 a.m., the vehicle was found near an apartment complex where appellant had formerly lived. The gun used in the killing was never found. At 7:00 a.m. appellant called the Ortenblad residence and spoke to his daughter, Melanie. Melanie testified she informed appellant he had killed Kalen and he was surprised. This testimony was impeached by the testimony of Investigator Rolland Johnson, who testified that after the phone call Melanie Flores called him and said appellant had called and asked how Kalen was and said he had "gotten rid of the gun." Appellant turned himself in to Hennepin County authorities later that morning.

An autopsy was performed on Kalen Ortenblad on July 31, 1986, by Dr. Laurel Krause. Dr. Krause testified at trial four bullet wounds were found, one in the groin and three in the back, but the groin wound alone was not fatal. Dr. Krause stated the shot to the groin was from straight ahead of the victim, while the shots to the back were at an angle. The cause of death was loss of blood and asphyxia due to blood in the lungs.

Roger Papke, a crime laboratory analyst with the Minnesota Bureau of Criminal Apprehension, testified at trial bullet casings found near Kalen Ortenblad's body after the shooting were consistent with those from a .22 caliber Colt Woodsman pistol. Over objection, the trial court admitted into evidence a Colt Woodsman pistol for demonstrative purposes. The court cautioned the jury this was not "the gun that was used in the shooting, but is a gun that is very similar to that that was used in the shooting."

Appellant testified at trial. He testified that on July 30, 1986, he had a beer during lunch and after leaving work that afternoon he purchased a 12–pack of beer and drank one or two beers on the way home. At home, he continued to drink beer. Flores estimated he consumed 18 or 20 beers that day. He testified he did not remember arguing with Betty Ortenblad regarding the incident in the Bahamas and did not remember the shooting except for "voices and a boom."

Dr. Richard Jensen, an analytical chemist and toxicologist, testified if appellant consumed 18 12–ounce beers between 4:30 p.m. and 10:30 p.m., his blood alcohol concentration would have been between .25 and .31 percent. He estimated Flores' blood alcohol concentration would have been between .13 and .16 percent if he had consumed 12 beers during this time, and between .01 and .04 percent if he had consumed 6 beers. The trial court sustained an objection to Dr. Jensen's being asked to estimate Flores' blood alcohol concentration 12 hours after the shooting.

On appeal, appellant raises the following issues:

1. Whether the trial court erred in its instructions to the jury on premeditation and the intoxication defense.

2. Whether there is sufficient evidence to sustain the conviction of murder in the first degree.

3. Whether the trial court committed reversible error by (a) refusing to allow a defense expert to testify regarding defendant's possible blood alcohol concentration twelve hours after the shooting; (b) admitting testimony defendant had made a threat against decedent's friends; and (c)

admitting a replica of the murder weapon as demonstrative evidence.

■ 1. The trial court instructed the jury on the issue of premeditation as follows:

Premeditation means that Defendant considered, planned, prepared for, or determined to commit the act before he committed it. *Premeditation may be formed at anytime, (sic) moment or instant before the killing. Premeditation means thought of beforehand for any length of time, no matter how short.* Premeditation, being a process of the mind, is wholly subjective and hence not always susceptible to proof by direct evidence. It may be inferred from all the circumstances surrounding the event. However, an unconsidered or rash impulse, even though it includes an intent to kill, is not premeditated.

(Emphasis added.) The emphasized portion of the instruction departed from CRIMJIG 11.02, which reads in relevant part:

Premeditation means that defendant considered, planned, prepared for, or determined to commit the act before he committed it. Premeditation, being a process of the mind, is wholly subjective and hence not always susceptible to proof by direct evidence. It may be inferred from all the circumstances surrounding the event. *It is not necessary that premeditation exist for any specific length of time. A premeditated decision to kill may be reached in a short period of time.* However, an unconsidered or rash impulse, even though it includes an intent to kill, is not premeditated.

10 Minn. Dist. Judges Ass'n, *Minnesota Practice, CRIMJIG* 11.02 (1985) (emphasis added).

Appellant contends the trial court's instruction on premeditation was an inaccurate explanation of the law, failing to properly explain the distinction between premeditation and intent to kill. In construing a charge to a jury, the jury instructions must be reviewed as a whole. *See State v. Williams,* 324 N.W.2d 154, 159 (Minn. 1982). The jury instructions must be viewed in their entirety to determine whether they fairly and adequately explained the law of the case. *State v. Jones,* 347 N.W.2d 796, 801 (Minn.1984).

In *State v. Marsyla,* 269 N.W.2d 2 (Minn. 1978), this court cited with approval 9 McCarr, *Minnesota Practice, Criminal Law and Procedure,* § 1521 (1976), which read in part:

"All the time needed for premeditation or deliberation is that required to form the intent to kill. Thus, the following instruction was sustained in *State v. Prolow* [98 Minn. 459, 461, 108 N.W. 873, 874 (1906)]:

"The 'premeditation may be formed at any time, moment or instant before the killing. Premeditation means thought of beforehand for any length of time, no matter how short. There need be no appreciable space of time between the intention of killing and the act of killing. They may be as instantaneous as the successive thoughts of the mind.'

"In *State v. Hyleck* [286 Minn. 126, 140, 175 N.W.2d 163, 172, certiorari denied, 399 U.S. 932, 90 S.Ct. 2267, 26 L.Ed. 2d 803 (1970)] the court said: 'Premeditation is not a coefficient of time and can never be presumed from a given state of facts.'

"In *State v. Keaton* [258 Minn. 359, 363, 104 N.W.2d 650, 654, 86 A.L.R. 649, 653 (1960)], the Court related: 'Premeditated design denotes pre-existing reflection and deliberation encompassing more than the mere intent to kill.' "

*State v. Marsyla,* 269 N.W.2d 2, 5–6 (Minn. 1978).

■ In a prosecution for murder in the first degree, extensive planning and calculated deliberation need not be shown by the prosecution. The requisite "plan" to commit first degree murder "can be formulated virtually instantaneously by a killer." *State v. Neumann,* 262 N.W.2d 426, 430 (Minn.1978).

The trial court evidently relied on *Marsyla* and *Prolow* in formulating its instruction on premeditation. We find that the

trial court's instruction, read as a whole, was not error.

2. The appellant argues further the trial court's instruction on premeditation was erroneous and worded in a way to confuse the jury and disadvantage him. We disagree. Although it would have been preferable for the trial court to use the words of CRIMJIG 11.02, we cannot say the trial court's instruction constituted error. The instruction was technically accurate under *Marsyla* and *Neumann*. The portion of the instruction appellant complains of as prejudicial was counterbalanced by the trial court's instruction that "an unconsidered or rash impulse, even though it includes an intent to kill, is not premeditated." The jury instruction, when viewed as a whole, appears to have fairly and adequately explained the law of premeditation and was not error.

■ 3. The appellant contends next the trial court erred in its instruction on intoxication. The trial court instructed the jury as follows:

It is not a defense to a crime that a Defendant was intoxicated at the time of his act, if he became intoxicated voluntarily. But where, as in this case, an element of the crime requires proof that the Defendant had a particular intent or a particular state of mind, then you should consider whether the Defendant was intoxicated and, if so, whether he was capable of forming the required intent or state of mind. A required particular intent in both Murder in the First Degree—with premeditation, and Murder in the Second Degree—without premeditation, is that the Defendant had the intent to kill. Additionally, it must be proven in Murder in the First Degree—with premeditation, that Defendant had a particular state of mind, namely, that he acted with premeditation.

*There is no presumption that a Defendant who has been drinking is incapable of formulating the intent to commit a crime.* Defendant has the burden of establishing by the greater weight of the evidence that he was too intoxicated to have the intent to kill or to

premeditate. The greater weight of the evidence means that the evidence must lead you to believe that it is more likely that his claim is true than not true. If the evidence does not lead you to believe that it is more likely that the claim is true than not true, then the claim of intoxication has not been proved.

However, you must keep in mind that the State must prove beyond a reasonable doubt that the Defendant had the required intent.

The appellant argues the trial court's statement, "There is no presumption that a Defendant who has been drinking is incapable of formulating the intent to commit a crime," although technically correct, was erroneous. Appellant cites *State v. Underwood*, 281 N.W.2d 337 (Minn.1979), where this court struck down a jury instruction which stated: "Except as otherwise provided by law, in every criminal proceeding, a person is presumed to be responsible for his acts and the burden of rebutting such a presumption is upon him." *Id.* at 343. We held the instruction was improper as it tended to confuse the jury and subverted the presumption of innocence. *Id.* at 344.

In *State v. Wahlberg*, 296 N.W.2d 408, 418 (Minn.1980), we held it was incorrect to instruct the jury that "a person under the influence of intoxicating liquors or drugs is presumed to know, intend and remember criminal acts which he does while so intoxicated to the extent as would a man not influenced by such intoxicants." While incorrect, the instruction was deemed harmless error under the facts of that case. *Id.*

The cases relied upon by appellant are distinguishable from this matter. In *Underwood* and *Wahlberg*, the instructions found improper stated a presumption existed. In this case, the trial court instructed the jury no presumption existed the defendant was incapable of formulating the intent to commit the crime. The instruction given does not appear to be unduly confusing to a jury nor unduly burdensome upon the defendant.

The statement, "There is no presumption that a Defendant who has been drinking is incapable of formulating the intent to com-

mit a crime," is an accurate statement of the law. *See State v. Lund,* 277 Minn. 90, 151 N.W.2d 769 (1967). Moreover, the sentence complained of by appellant is only a small part of a lengthy instruction on intoxication. At the conclusion of its instruction the court reiterated, "You must keep in mind that the State must prove beyond a reasonable doubt that the Defendant had the required intent." The instruction, when viewed as a whole, appears to be balanced and accurate and was not error.

■ 4. In a criminal case, we must painstakingly review the record to determine if the evidence was sufficient to permit the jury to reach the conclusion it did. *State v. Ellingson,* 283 Minn. 208, 211, 167 N.W.2d 55, 57 (1969). We will not disturb the verdict if the jury, acting with due regard for the presumption of innocence and for the necessity of overcoming it by proof beyond a reasonable doubt, could reasonably conclude a defendant was proven guilty of the offense charged. *State v. McCullum,* 289 N.W.2d 89, 91 (Minn.1979). We examine the evidence by viewing it in the light most favorable to the verdict, and will assume the jury disbelieved any testimony in conflict with the result it reached. *State v. Oevering,* 268 N.W.2d 68, 71 (Minn.1978).

■ "Premeditation" means "to consider, plan or prepare for, or determine to commit" the act prior to its commission. Minn.Stat. § 609.18 (1986). Premeditation must usually be inferred from all of the circumstances surrounding the homicide. *State v. Wahlberg,* 296 N.W.2d at 415. Events both before and after a death are relevant to the totality of circumstances from which inferences of intent and premeditation may be drawn. *State v. Andrews,* 388 N.W.2d 723 (Minn.1986).

In *Bangert v. State,* 282 N.W.2d 540, 544 (Minn.1979), we said there was sufficient evidence of premeditation where the defendant obtained a rifle in one part of the house, carried it to the bedroom, and shot the victim three times. Similarly, in *State v. Jackman,* 396 N.W.2d 24 (Minn.1986), we held the evidence was sufficient to support the jury determination the defendant's

actions in shooting an employee of a bar were premeditated and intentional where the defendant threatened the employee, then left the bar before returning with a shotgun and shooting the employee while moving toward him and pausing between shots. *Id.* at 30.

■ Intoxication at the time of a killing may properly be considered in determining whether the accused acted with premeditation. *State v. Neumann,* 262 N.W.2d 426, 431 (Minn.1978). Whether or not a defendant's condition of intoxication negates the existence of a culpable mental state required to convict him is a question to be determined by the jury. *Id.* As long as the record contains sufficient evidence to support the conclusion reached by the jury on the intoxication issue, we will not reverse that conclusion despite the existence of some evidence to the contrary. *Id.* at 432.

In *State v. Merrill,* 274 N.W.2d 99 (Minn. 1978), we held evidence of premeditation was sufficient to sustain a conviction of murder in the first degree, despite the defendant's statement to police officers he had drunk twelve beers and three quarters of a pint of brandy on the night of the killing, in view of other testimony defendant did not appear intoxicated on the night of the killing, and defendant's admission of striking the victim with a candy dish, obtaining a knife, and returning to the bedroom to stab the victim several times. *Id.* at 111–12.

Appellant urges the evidence does not support a conviction for first degree murder due to evidence of extreme intoxication. He also argues he lacked a motive for killing Kalen Ortenblad. The lack of a motive, appellant argues, supports the inference the killing was the result of intoxication rather than premeditation. Although the record contains evidence which could support the claim appellant was intoxicated at the time of the shooting, there is considerable evidence to support the jury's verdict. Appellant's claim he drank 18–20 beers was not corroborated, and on cross-examination, he testified he could not be certain how many beers he drank.

The jury could reasonably infer premeditation from the appellant's actions before and after the shooting. Following the altercation with Kalen before the shooting, appellant went upstairs. Betty Ortenblad testified that when he returned downstairs he was carrying a gun. Shortly after the shooting, she told the police that appellant shot Kalen once in the stomach and then, after a pause, fired three more shots into Kalen Ortenblad's back as he lay on the floor. The appellant's actions—going to another portion of the house to get a gun and pausing between shots at the victim—are consistent with the factors found relevant to premeditation and intent in *Bangert v. State* and *State v. Jackman.* After the shooting, appellant obtained the car keys and drove quickly away to an apartment complex where he formerly had lived. He remained undetected by police until he turned himself in the following morning. In addition, Investigator Johnson testified Melanie Flores told him appellant called her the morning after the shooting, asked about Kalen's condition and said he had "gotten rid of the gun." From this testimony the jury could reasonably infer the appellant was not too intoxicated to be aware of his actions.

It appears the jury here chose to disbelieve the appellant's version of the shooting and believe the state's evidence. Obtaining a gun from another part of the house prior to the shooting, pausing between shots at the victim, locating the car keys, driving to his former residence, and disposing of the gun support the inference appellant was capable of premeditation at the time of the shooting. We hold there is sufficient evidence to support the conviction of murder in the first degree.

■ 5. Rulings on evidentiary matters rest within the sound discretion of the trial court. *State v. Olkon*, 299 N.W.2d 89, 101 (Minn.1980), *cert. denied*, 449 U.S. 1132, 101 S.Ct. 954, 67 L.Ed.2d 119 (1981). The first evidentiary ruling appellant alleges was error involves the testimony of appellant's expert witness regarding intoxication. Dr. Richard Jensen, an analytical chemist and toxicologist, testified about appellant's blood alcohol concentration at the time of the killing. The trial court sustained the state's objection on relevancy to questions about what blood alcohol concentration twelve hours after the shooting would have been and whether or not there would be alcohol in the blood system twelve hours later. Appellant contends the trial court's refusal to allow Dr. Jensen to testify as to appellant's possible blood alcohol concentration twelve hours after the shooting was error.

The trial court has wide discretion in matters concerning relevancy of evidence. *State v. Swain*, 269 N.W.2d 707, 714 (Minn. 1978). "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Minn.R.Evid. 401.

Appellant argues evidence of appellant's blood alcohol concentration twelve hours after the shooting, about the time appellant turned himself in to the authorities, is relevant to show the omissions by the police in investigating whether intoxication was involved in the offense.

At trial, Investigator Roland Johnson testified appellant's blood alcohol was not measured when he was taken into custody because 12–14 hours had passed since the shooting and it could not be determined whether the alcohol in the appellant's system had been consumed prior to or after the shooting occurred. Thus, it is difficult to see the relevance of defense counsel's inquiry of appellant's blood alcohol concentration twelve hours after the shooting, or how appellant was prejudiced by the trial court's ruling. Dr. Jensen was allowed to hypothesize as to appellant's blood alcohol concentration at the time of the murder. This is the only time relevant to the intoxication defense. The trial court properly exercised its discretion in sustaining the state's objection.

■ 6. Appellant next contends the trial court erred by allowing testimony regarding a threat he made against certain of the victim's friends on the day of the shooting. At trial, Pete Chouinard, a friend of

the victim, testified that approximately four and one-half hours before the shooting appellant stated if he ever caught certain friends of Kalen Ortenblad at the Ortenblad home without Kalen being present, he would "cut their balls off."

■ The state cannot present evidence of prior misconduct to establish a defendant's assaultive propensity, nor is such evidence admissible to prove a defendant's guilt of the crime charged. *State v. Langley,* 354 N.W.2d 389, 396–97 (Minn.1984).

■ We will not reverse a trial court's admission of evidence of other crimes and bad acts unless an abuse of discretion is clearly shown. *State v. Ture,* 353 N.W.2d 502, 515 (Minn.1984). For such evidence to be admissible, the trial court must determine there is "clear and convincing" evidence the defendant participated in the crime or bad acts sought to be admitted. *State v. Doughman,* 384 N.W.2d 450, 454 (Minn.1986). The court must also determine the evidence of prior crimes or bad acts is "relevant and material to the state's case." *Id. See also State v. Morrison,* 310 N.W.2d 135, 137 (Minn.1981). It must also rule the probative value of the evidence outweighs any potential for unfair prejudice. *State v. Bolts,* 288 N.W.2d 718, 719 (Minn.1980).

Minnesota Rules of Evidence provide:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Minn.R.Evid. 404(b).

Evidence of a defendant's assaultive conduct toward a third party related to or a close friend of the victim is generally admissible both to show a "highly strained relationship" between the defendant and the victim and to establish a motive and premeditated intent on the part of the defendant to kill the victim. *State v. Blanchard,* 315 N.W.2d 427, 431 (Minn.1982). *See*

*also State v. Johnson,* 256 N.W.2d 280, 286–87 (Minn.1977).

In *Blanchard,* the court admitted evidence the defendant physically abused the victim's infant son as relevant to the strained relationship between the victim and defendant. *Blanchard,* 315 N.W.2d at 431. In *Johnson,* the court admitted evidence defendant pointed a rifle at two of the victim's friends shortly before defendant shot and killed the victim as relevant to the victim and defendant's strained relationship. *Johnson,* 256 N.W.2d at 286–87.

Appellant argues testimony regarding appellant's threat toward certain of Kalen Ortenblad's friends failed to show motive or intent, as the statement did not involve the victim and was not made in the victim's presence. Finally, appellant argues the statement was unduly prejudicial, as it depicted appellant as an assaultive man.

In view of the broad discretion given to the trial court, the testimony was properly admitted. The statement by appellant threatening Kalen Ortenblad's friends tends to show the strained relationship between the appellant and the victim, as shown in the *Johnson* and *Blanchard* cases. The strained relationship between the appellant and Kalen Ortenblad as a result of appellant's dislike of Kalen's friends serves to establish motive, intent and absence of mistake or accident.

■ 7. Finally, appellant contends the trial court erred in admitting for demonstrative purposes an alleged replica of the murder weapon. The weapon used to kill Kalen Ortenblad was never found by the police. At trial, Roger Papke, a crime laboratory analyst with the Minnesota Bureau of Criminal Apprehension, testified the markings on the four cartridge cases and one spent bullet found near the victim's body were consistent with those fired from a Colt Woodsman pistol. A proper foundation was laid for testimony regarding the weapon. The prosecution made no claim the weapon introduced was the actual weapon used in the shooting. Defense counsel had full opportunity to thoroughly cross-examine. Over appellant's objection, the Colt Woodsman pistol was admitted for

demonstrative purposes. The pistol was not given to the jury during its deliberations. The trial court properly instructed the jury, "[T]he gun that is being examined and testified to by Mr. Papke is not the gun that was used in the shooting, but is a gun that is very similar to that that was used in the shooting." The admissibility of demonstrative evidence is within the sound discretion of the trial court. *State v. Bott*, 310 Minn. 331, 338, 246 N.W.2d 48, 53 (1976).

The trial court did not abuse its discretion in admitting the weapon for demonstrative purposes.

Defendant's conviction is affirmed.